THOMAS, Judge.
 

 On July 13, 2004, at about 9:30 a.m., Kim Gallegly Wesson and her four children went to the Pell City Wal-Mart discount department store, operated by Wal-Mart Stores East, L.P. (“Wal-Mart”), to have the tires on Wesson’s automobile rotated and balanced. Wesson left her automobile at the tire and lube express department (“TLE department”) for the service to be performed. Wesson had assumed that the service would take 20-30 minutes, so she and her children walked around the Wal-Mart store awaiting the completion of the service to her automobile. When the automobile was not ready in about 30 minutes, Wesson decided to take her children, who were hungry and requesting breakfast, to the McDonald’s fast-food restaurant located inside the store. After finishing breakfast, Wesson checked again to see if her automobile service had been completed; it had not. Wesson and her children proceeded to the pharmacy department of the store, where Wilson dropped of one of her two prescriptions for refilling at the pharmacy counter. Wesson and the children then went to the electronics department of the store, where Wesson purchased additional minutes for her prepaid cellular telephone. When a third check on the status of her automobile yielded further waiting, Wesson dropped off her second prescription at the pharmacy counter for refilling. Wesson then decided to shop for groceries for the family’s trip to Florida.
 

 Once Wesson had completed her grocery shopping, she returned to the pharmacy department to retrieve her prescriptions. By this time, the pharmacy associate, Jennifer Vincent, had notified Kyle Jack, the in-store loss prevention associate, that Wesson would be picking up prescriptions from the pharmacy. Because Wal-Mart’s policy allows customers to pay for most prescriptions at any check-out counter, the store has a computer system that keeps track of the time and place of the payment to ensure that all prescriptions picked up from the pharmacy department are ultimately paid for. Wesson’s name had appeared on a list of persons who had not paid for prescriptions picked up from the pharmacy department on at least two other occasions, resulting in her placement on a “watch list” of sorts.
 

 Once Wesson arrived at the pharmacy department to retrieve her prescriptions, Wesson said that an announcement came over the loudspeaker to inform her that her automobile service was completed. Wesson informed the pharmacy associate that she would pay for her prescriptions when she checked out her groceries and paid for her car service. Vincent gave Wesson both of her prescriptions; Wesson owed money on both prescriptions. Wesson and her children left the pharmacy department and returned to the TLE department; they were followed by Jack. Once she reached the check-out counter at the TLE department, Wesson proceeded to place her grocery items on the counter and to check out. Wesson did not, however, place her prescriptions on the counter to check out. Once she had paid for her groceries and car service, Wesson and her children left the store.
 

 Tara Swain, the associate who checked out Wesson’s groceries at the TLE department, testified that she had asked Wesson whether she wanted to pay for her prescriptions. Swain said that Wesson indicated that she had paid for the prescriptions already. Jack testified that he had seen Swain motion toward the child-seat portion of the cart, in which the prescriptions, Wesson’s purse, and some of the
 
 *749
 
 children’s dolls or toys sat, as she completed checking out Wesson’s grocery items. Although he said that he did not hear Swain’s exact question or Wesson’s first answer to that question, Jack said that he moved closer to Wesson and heard her refer to the items in the child-seat portion of the cart as being her personal items. Jack said that he saw Wesson leave the store without paying for the prescriptions, so he followed her outside to apprehend her.
 

 Once she reached the parking lot, Wesson and her children began to place her purchases into the automobile. Jack and another associate, Nathan Nichols, approached Wesson while she unloaded her groceries. Jack addressed Wesson by name and, according to Wesson, said: “Excuse me, but I don’t think you paid for those prescriptions.” Wesson said that she admitted that she had not, in fact, paid for the prescriptions.
 

 According to Wesson, Jack told her that she needed to come back inside to fill out some forms and that she would be allowed to pay for the prescriptions. Wesson and her children returned to the store with Jack and the other associate. Once inside the store, Jack led Wesson and her children to the loss-prevention office in the front of the store, where, according to Wesson, Jack locked the door to the office. Wesson said that Jack asked for her driver’s license and Social Security number and that he gave her several papers to sign. Wesson admitted that she did not read the papers that Jack gave her to sign other than to notice that the Wal-Mart logo appeared on them. Wesson said that, at that time, she still believed that she was simply going to have to pay for her prescriptions.
 

 However, according to Wesson, once Jack secured her signature on the forms, he raised his voice and told her that she would be trespassing if she ever came back into a Wal-Mart store. She said that Jack accused her of stealing from the store “all the time” and told her, in front of her children, that she would be going to jail. Wesson said that Jack informed her that he had notified the police. Wesson said that she tried to reason with Jack, telling him that she had simply forgotten to pay and that she just wanted to settle the matter by paying for her prescriptions. Wesson further testified that Jack had told her that it did not matter to him whether she was guilty of theft under the law but that his job was loss prevention and that her leaving without paying for the items was a loss to Wal-Mart. Three Pell City police officers responded to Jack’s earlier telephone call; they took Wesson into custody when they arrived.
 

 Jack secured a warrant for theft of property in the third degree against Wesson. Wal-Mart then prosecuted Wesson in the municipal court. After a trial, the action was “dismissed by agreement,” according to a notation on the case-action-summary sheet of the municipal-court criminal case. That document also indicates that Wesson paid court costs.
 

 Wesson sued Wal-Mart and Jack, asserting claims of malicious prosecution and false imprisonment arising from the events of July 13, 2004, and the resulting criminal prosecution. Wal-Mart and Jack moved for a summary judgment, which Wesson opposed. As exhibits to their motion for a summary judgment, Wal-Mart and Jack submitted Wesson’s deposition, Jack’s deposition, the trial transcript of the criminal prosecution of Wesson, and the case-action-summary sheet of the municipal-court criminal action. Wal-Mart and Jack argued in their summary-judgment motion that Wesson could not establish the elements of a malicious-prosecution claim or a false-imprisonment claim. The trial court
 
 *750
 
 entered a summary judgment in favor of Wal-Mart and Jack. After her post-judgment motion was denied, Wesson appealed to the Alabama Supreme Court, which transferred the appeal to this court, pursuant to Ala.Code 1975, § 12-2-7(6).
 

 On appeal, Wesson challenges the summary judgment in favor of Wal-Mart and Jack because, she says, genuine issues of material fact preclude the entry of a summary judgment. She specifically argues that she can establish the elements of her malicious-prosecution claim and her false-imprisonment claim. We disagree.
 

 We review a summary judgment de novo; we apply the same standard as was applied in the trial court. A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing “that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law.” Rule 56(c)(3);
 
 see Lee v. City of Gadsden,
 
 592 So.2d 1036, 1038 (Ala.1992). If the movant meets this burden, “the burden then shifts to the nonmovant to rebut the movant’s prima facie showing by ‘substantial evidence.’ ”
 
 Lee,
 
 592 So.2d at 1038 (footnote omitted). “[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.”
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989);
 
 see
 
 Ala.Code 1975, § 12-21-12(d). Furthermore, when reviewing a summary judgment, the appellate court must view all the evidence in a light most favorable to the nonmovant and must entertain all reasonable inferences from the evidence that a jury would be entitled to draw.
 
 See Nationwide Prop. & Cas. Co. v. DPF Architects, P.C.,
 
 792 So.2d 369, 372 (Ala.2000); and
 
 Fuqua v. Ingersoll-Rand Co.,
 
 591 So.2d 486, 487 (Ala.1991).
 

 It is well settled that a malicious-prosecution action is disfavored in the law.
 
 Eidson v. Olin Corp.,
 
 527 So.2d 1283, 1284 (Ala.1988);
 
 Phillips v. K-Mart Corp.,
 
 682 So.2d 1390, 1393 (Ala.Civ.App.1996). As explained in
 
 Eidson,
 
 the basis for this disfavor stems from an individual’s right to seek redress or to enforce rights through the legal process free from fear that an adverse judgment will result in one’s liability for civil damages.
 
 Eidson,
 
 527 So.2d at 1284. In order to establish a claim of malicious prosecution, a plaintiff must prove (1) that a judicial proceeding was initiated by the defendant against the plaintiff, (2) that the judicial proceeding was initiated by the defendant without probable cause, (3) that the judicial proceeding was initiated by the defendant with malicious intent, (4) that the judicial proceeding terminated in the plaintiffs favor, and (5) that the plaintiff suffered damage as a result of the defendant’s initiation of the judicial proceeding.
 
 Phillips,
 
 682 So.2d at 1393.
 

 In their summary-judgment motion, Wal-Mart and Jack argued that Wesson could not establish that the judicial proceeding instituted against her was initiated without probable cause, that the judicial proceeding was initiated maliciously, or that the judicial proceeding was terminated in her favor. Because the summary judgment in favor of Wal-Mart and Jack need only be grounded on Wesson’s failure to create a genuine issue of material fact as to any one of the elements necessary to establish her claim of malicious prosecution,
 
 see Whitlow v. Bruno’s,
 
 567 So.2d 1235, 1237-38 (Ala.1990), we will address only the lack-of-probable-cause element of Wesson’s claim. Based on the evidence
 
 *751
 
 submitted in support of the summary-judgment motion, we conclude that Wesson has failed to adduce sufficient facts to overcome Wal-Mart and Jack’s motion for a summary judgment on the malicious-prosecution claim.
 

 “Probable cause is defined as ‘ “[a] reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged.’”
 
 Parisian Co. v. Williams,
 
 203 Ala. 378, 383, 83 So. 122, 127 (1919). ‘The question is not whether the [malicious prosecution] plaintiff was guilty of the thing charged, but whether the [malicious prosecution] defendant
 
 acted in good faith on the appearance of things’
 
 (Emphasis supplied.)
 
 Birwood Paper Co. v. Damsky,
 
 285 Ala. 127, 134-135, 229 So.2d 514, 521 (1969).”
 

 Eidson,
 
 527 So.2d at 1285. To determine whether a defendant had probable cause to institute a judicial proceeding, a “court must weigh [the defendant’s] actions in light of the facts as they appeared at the time” the judicial proceeding was instituted.
 
 Id.
 
 “ ‘If the facts on the issue of probable cause are not in dispute, whether such facts amount to probable cause is a question of law for the courts.’ ”
 
 Id.
 
 (quoting
 
 Hanson v. Couch,
 
 360 So.2d 942, 945 (Ala.1978)).
 

 The
 
 Eidson
 
 court further explained:
 

 “The test that [an appellate court] must apply when reviewing the lack-of-probable-cause element in a malicious prosecution case in which summary judgment has been granted to a defendant is as follows:
 
 Can one or more undisputed facts be found in the record below establishing that the defendant acted in good faith on the appearance of things as they existed when suit was filed, based upon direct evidence, or upon circumstantial evidence and inferences that can reasonably be drawn therefrom?
 
 If so, then summary judgment in favor of the defendant on plaintiffs malicious prosecution count would be appropriate.”
 

 Id.
 
 at 1285-86 (emphasis added).
 

 Wesson admitted that she left the Wal-Mart store without paying for her prescriptions. Although she denied having done so purposefully, Jack had information from which he could have reasonably concluded that Wesson had, indeed, intended to obtain her prescriptions without paying for them. First of all, Jack had knowledge that Wesson had allegedly left the store without paying for prescriptions on at least two other occasions. When notified that she was in the store and would be picking up her prescriptions, Jack waited in the pharmacy department to observe Wesson during the transaction, verified with the cashier that Wesson had not paid for the prescriptions upon which she owed money, and followed Wesson to the TLE department where he observed her pay for her groceries but not for her prescriptions. Jack testified that he had observed Swain motion toward the prescriptions in the cart while checking out Wesson’s groceries in the TLE department and that Wesson had still not paid for those prescriptions. Because Jack had observed Wesson when she twice had an opportunity to pay for the prescriptions and yet did not, Jack testified that he felt confident that Wesson had intended not to pay for those prescriptions. Based on the information he had at the time, Jack had probable cause to detain and suspect Wesson of committing theft of the prescriptions.
 

 Wesson argues that the termination of the municipal-court criminal proceeding in her favor creates an inference that Wal-Mart and Jack lacked probable cause to accuse her of theft. She relies on
 
 Chat-
 
 
 *752
 

 man v. Pizitz, Inc.,
 
 429 So.2d 969, 972 (Ala.1983), which indicates that a malicious-prosecution plaintiff “can make out a prima facie case of a lack of probable cause by showing that the criminal proceedings instituted against her by [the defendant] were
 
 nol pros sed.”
 
 Thus, Wesson argues, the fact that the criminal case against her was dismissed creates a fact question regarding probable cause to initiate the proceedings in the first place.
 

 Wal-Mart and Jack point out, however, that
 
 Chatman
 
 says much more about the use of a “nolle prosequi” or order of dismissal to prove a claim of malicious prosecution. In fact, the
 
 Chatman
 
 court stated that a prima facie case supported by a “nolle prosequi” or order of dismissal can be rebutted by proof that the dismissal resulted from a settlement between the parties.
 
 Chatman,
 
 429 So.2d at 971. Wal-Mart and Jack rely on the principle stated in
 
 Chatman
 
 that “[a] malicious prosecution plaintiff, having bought his peace, may not thereafter assert that the criminal proceedings were terminated in his favor.”
 
 Id.
 
 at 972. The
 
 Chatman
 
 court makes clear that unchallenged proof of settlement entitles a defendant to a judgment as a matter of law.
 
 Id.
 
 Although this discussion appears in the section regarding the “favorable disposition” element of a malicious-prosecution claim, the court indicated that the same “standard of proof’ regarding compromise applies to the attempt to use the favorable disposition of dismissal to establish a lack of probable cause.
 
 Id.
 

 The record in this case contains the case-action-summary sheet from the municipal court reflecting that the criminal case against Wesson was “dismissed pursuant to agreement.” The substance of the agreement does not appear in the record. The same case-action-summary sheet reflects, however, that Wesson was ordered to pay the court costs of the criminal case. Wesson herself testified that she did not know anything about an agreement; she said that she had paid court costs when her criminal attorney instructed her to do so. She further testified that she had thought that the criminal case had been dismissed because “the whole thing was stupid and the judge threw it out of court.”
 

 We agree that the record reflects that the criminal case was dismissed pursuant to an agreement, indicating, without actual dispute, that Wesson settled her criminal case and, therefore, “bought her peace.” Wesson, although she denied knowledge of any agreement, admitted that she had paid court costs at the instruction of her criminal attorney. Thus, the record conclusively establishes that Wesson’s criminal case was dismissed pursuant to an agreement requiring her to pay court costs. Just as such an agreement bars the plaintiff from using the dismissal of the criminal case as a basis for arguing that the proceeding was terminated in her favor, it also bars the plaintiff from using the dismissal as prima facie evidence of a lack of probable cause.
 
 Chatman,
 
 429 So.2d at 971-72.
 

 Turning now to the false-imprisonment claim, we note that our conclusion that Wesson failed to create a genuine issue of material fact regarding the lack of probable cause as it relates to her malicious-prosecution claim is determinative as to this claim as well. Pursuant to Ala. Code 1975, § 15-10-14(a) and (c), both a merchant and its employee are immune from claims of false imprisonment instituted by a person detained on the suspicion of shoplifting, provided that the merchant or its employee had probable cause for believing that the person detained was attempting to shoplift. Those sections provide:
 

 “(a) A peace officer, a merchant or a merchant’s employee who has probable
 
 *753
 
 cause for believing that goods held for sale by the merchant have been unlawfully taken by a person and that he can recover them by taking the person into custody may, for the purpose of attempting to effect such recovery, take the person into custody and detain him in a reasonable manner for a reasonable length of time. Such taking into custody and detention by a peace officer, merchant or merchant’s employee shall not render such police officer, merchant or merchant’s employee criminally or civilly liable for false arrest, false imprisonment or unlawful detention.
 

 [[Image here]]
 

 “(c) A merchant or a merchant’s employee who causes such arrest as provided for in subsection (a) of this section of a person for larceny of goods held for sale shall not be criminally or civilly hable for false arrest or false imprisonment where the merchant or merchant’s employee has probable cause for believing that the person arrested committed larceny of goods held for sale.”
 

 § 15-10-14.
 

 As noted above, Jack had probable cause to suspect Wesson had purposefully failed to pay for her prescriptions based on the information he had available to him at the time of Wesson’s detention. Wesson admits that she left the Wal-Mart store without paying for her prescriptions. Jack had information compiled by Wal-Mart indicating that Wesson had left the store without paying for her prescriptions on at least two other occasions, and Jack observed Wesson leaving the store on July 13, 2004, after having two opportunities to pay for her prescriptions. Because there existed probable cause to detain Wesson, Wal-Mart and Jack are immune from Wesson’s false-imprisonment claim.
 

 Because we have determined that Wesson failed to establish that Wal-Mart and Jack did not have probable cause to institute criminal proceedings against Wesson for theft of the prescriptions, we affirm the summary judgment in Wal-Mart’s and Jack’s favor on the malicious-prosecution claim. Likewise, because of the existence of probable cause for Wesson’s detention, we affirm the summary judgment in favor of Wal-Mart and Jack on the false-imprisonment claim because, under § 15-10-14(a) and (c), they are immune from that claim.
 

 AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
 

 MOORE, J., concurs in the result, without writing.